IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VESTA LEWIS,<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br><br>    Defendant. | No. C 06-6608 SI<br><br>**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND REMANDING THE CASE FOR PROCEEDINGS CONSISTENT WITH THIS RULING** |

Claimant Vesta Lewis filed this action seeking review of the Social Security Administration's ("SSA") decision on two matters related to her claims for disability benefits. The parties have filed cross-motions for summary judgment. After considering the parties' arguments and the administrative record the Court hereby DENIES both motions for summary judgment and REMANDS the case to the Commissioner for proceedings consistent with this ruling.

**BACKGROUND**

Claimant argues that she meets Listing 12.05(C) of 20 C.F.R. Part 404, Subpart P, Appendix 1. The pertinent provisions of Listing 12.05 state that:

> Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied . . . C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. In order to meet these requirements of Listing 12.05(C),

1 *"*a claimant must i) have a valid verbal, performance or full scale IQ of 60 through 70, ii) have a
2 physical or other mental impairment imposing additional and significant work-related limitations of
3 function, and iii) show that the mental retardation was initially manifested during the developmental
4 period (before age 22).*"* *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003).

## I. Factual background

Claimant is an unemployed 50 year-old mother of five. Administrative Record ("AR") at 829. According to the first ALJ who denied her claim, claimant "has been raped by every father of her children." *Id.* at 50. She spends most of her day caring for the two minor children who live with her. *Id.* at 829, 840. She lives with these minor children, as well as with her 20-year-old child, at a house next door to other members of her family, presumably her parents. *Id.* at 839. Claimant testified that her father and mother, as well as other family members, helped her out as she was raising her children, including "taking [her] to make [sic] groceries" and taking her "around to the store and stuff." *Id.* at 839-40. She spent fifteen years, until 2001, working in the food service industry, mainly as a service worker with limited responsibilities. *Id.* at 500-520, 548-557, 849. Her positions required mostly simple repetitive tasks such as filing, filling out paperwork as well as preparing and serving meals. *Id.* Claimant asserts she always had difficulties maintaining employment and successfully performing her assigned tasks. *Id.* Claimant also testified that her co-workers often helped her complete extremely simple work-related tasks such as completing paperwork and attaching name tags to serving trays. *Id.* at 845-846.

With few exceptions, claimant received all her academic instruction in "special education" programs, beginning in the first or second grade. *Id.* at 829-830, 832. After graduating from Richmond High School, claimant attended Contra Costa College. *Id.* at 830. Of the three academic courses claimant enrolled in, two – English and math – were administered by the college's special education program. *Id.* at 831. The only junior college classes claimant took that were not considered special education were a typing/computer class and a physical education class. *Id.* Claimant did not complete

2

her first semester and has not since resumed her education. *Id.* at 829, 832.

On September 10, 2001, claimant alleges she became disabled due to "back injury, slow learner, poor memory, several health problems and learnings [sic] disability." *Id.* at 20. Almost every doctor who subsequently assessed claimant's mental health found that, at the least, her intellectual functioning capacity was impaired. *Id.* at 231-383. From 2001 to 2005, claimant participated in three examinations of her intelligence, using WAIS-III IQ tests. *Id.* at 26. WAIS-III IQ tests produce three different IQ scores: a verbal IQ, a performance IQ, and a full-scale IQ. *Id.* Of the three exams claimant took, the tests administered by Dr. Marinos and Dr. Bruce yielded scores below 70, meeting the second prong of Listing 12.05C. *Id.* However, Dr. Bruce opined that the testing he administered had been compromised.

## II. Procedural history

Claimant has submitted four separate applications for disability insurance benefits and Supplemental Security Income ("SSI") based on physical and mental impairments. *Id.* 20. She submitted her first concurrent applications in 1996 and a second in 1999. *Id.* Both were denied initially and upon reconsideration and claimant did not appeal either decision. *Id.* Claimant submitted concurrent applications again in 2001, which were subsequently denied; however, she requested a hearing before an administrative law judge ("ALJ"). *Id.* On January 29, 2003, ALJ Churchill affirmed the denial and, subsequently, the SSA Appeals Council denied claimant's request for review. *Id.*

Claimant took no further action on those claims, and instead submitted a new set of concurrent applications in November 2003. *Id.* These applications were denied initially and upon reconsideration. *Id.* Claimant again requested a hearing on her denial. ALJ Berlin oversaw the hearing, reviewed claimant's claims, and affirmed both decisions. *Id.* at 28-29. Claimant then requested review by the Appeals Council but it denied her request. *Id.* at 11. She then filed a complaint in this Court.

Now before the Court are the parties' cross-motions for summary judgment. Claimant alleges that the second ALJ decision made a legal error in determining that she did not meet step three of 20 C.F.R. § 416.920, and that the rejection of her verbal IQ score is not supported by substantial evidence.

Defendant contends that the ALJ's decision was free from legal error and supported by substantial evidence.

**LEGAL STANDARD**

The Social Security Act, 42 U.S.C. § 405(g), authorizes judicial review "after any final decision of the Commissioner of Social Security." The Court may conduct only a limited review of the final decision and may disturb the decision "only if it is not supported by substantial evidence or if it is based on legal error." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th Cir. 2005); *see also Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). Even if substantial evidence supports the ALJ's factual findings, his decision must be set aside if improper legal standards were applied in reaching that decision. *See Frost v. Barnhart*, 314 F.3d 359, 367 (9th Cir. 2002).

The reviewing court has discretion to remand a case for further evidence, or to award benefits. *Moore v. Comm'r Soc. Sec. Admin.*, 278 F.3d 920, 926 (9th Cir. 2002). Evidence should be credited and an immediate award directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

**DISCUSSION**

The parties' motions for summary judgment focus on two issues. First, whether the second ALJ erroneously determined that the record did not contain sufficient evidence to prove a change in circumstances that would overcome the presumption of nondisability. Second, the parties dispute

4

whether the second ALJ correctly found that claimant did not meet Listing 12.05(C).[1]

**I.      Overcoming the presumption of nondisability**

Claimant argues that the ALJ's decision was based on an erroneous interpretation of the *Chavez* principle and that her new verbal IQ score of 68 should have overcome the presumption of nondisability. When a claimant reapplies for benefits based on the same impairments as a previously denied claim, the second ALJ applies the first ruling and presumes the claimant is not disabled. *See Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). This "presumption of nondisability" serves as the SSA's equivalent of collateral estoppel. *Id*. To avoid an application of collateral estoppel and overcome the presumption of continuing nondisability, the claimant "must prove 'changed circumstances' indicating a greater disability." *Id*. The Ninth Circuit has explained that "[t]he claimant need not . . . demonstrate that his medical or psychiatric condition has worsened to show changed circumstances. Other changes suffice . . . [f]or example, a change in claimant's age category . . . [or] where the claimant raises a new issue, such as the existence of an impairment not [previously] considered." *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1996) (citations omitted).

The ALJ did not properly apply the *Chavez* principle and based his decision on legal error. The ALJ reasoned that claimant had not proven a change in circumstances because he "[did] not find any significant change in the claimant's overall status," and "[did] not find the IQ studies performed by Dr. Marinos to be sufficient to establish intellectual functioning below the range of borderline functioning." AR at 25, 26. The ALJ's changed circumstance analysis turned on whether there had been a change in claimant's overall condition. However, as *Lester* indicates, a change that sufficiently overcomes the presumption of nondisability is not limited to a change in a claimant's overall condition – other changes

---

[1] The Court first addresses a threshold issue with regard to the organization of the ALJ's opinion. At times it is unclear what issues are being addressed in different portions of the ALJ's analysis. Several issues are addressed under the guise of a "changed circumstance" analysis, including the presumption of nondisability, whether claimant met Listing 12.05(C), and, implicitly, the validity of claimant's newest IQ score. The Court has made its best effort to catagorize different points in the analysis that relate to the pertinent issues.

5

may suffice. *See Lester*, 81 F.3d at 827. In *Lester*, the Ninth Circuit held that the claimant's change in age-status precluded an application of res judicata because age-status could have been outcome-determinative in the listing at issue in that case. *See id.* Similarly, in the context of developmental disabilities, the SSA's regulations regarding intelligence tests explain that "[s]tandardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered under the provisions of 12.05A." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(b). Indeed, the listing that claimant seeks to meet requires "a valid verbal, performance, or full scale IQ of 60 through 70," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C), and only one low score within this range is necessary to meet the first prong of § 12.05(C), *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987); *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal. 1996). Given this requirement and the potential importance of a single IQ score, it is clear that an intervening change in a claimant's test results demonstrating the claimant has scored within the range required by the regulation is a "changed circumstance" for purposes of *Chavez*. Just as a claimant's age was potentially outcome-determinative in *Lester*, claimant's IQ score could be outcome-determinative for her disability determination. *See Lester*, 81 F.3d at 827. In claimant's first hearing before the ALJ in 2003, she presented no IQ scores below a score of 70, such that she failed to meet the requirements of Listing 12.05(C). However, when appearing before the second ALJ in 2006, claimant set forth a verbal IQ score of 68 from tests done in 2004, thereby satisfying that prong of Listing 12.05(C). The Court concludes that claimant's new IQ score of 68, if valid, was a changed circumstance that overcomes the presumption of nondisability.

**II.      Validity of the 2004 IQ score**

That said, the ALJ possessed the power to reject claimant's 2004 IQ scores. If the ALJ properly rejected her verbal IQ score of 68, then claimant's argument for changed circumstances lacks merit because she relies solely on this score. Here, the ALJ did not explicitly reject the validity of claimant's new IQ score, so the Court must accept the score as valid. *See Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) (noting that "we are wary of speculating about the basis of the ALJ's conclusion

– especially when his opinion indicates that the conclusion may have been based exclusively upon an improper reason"). He did not, for instance, find that the score was invalid due to testing conditions or claimant's credibility.[2] Instead, the ALJ appears to have accepted the new IQ score but found that despite its validity, it was not "sufficient to establish intellectual functioning below the range of borderline intellectual functioning," AR at 26, and thus that claimant did not meet "the requirements of Listing section 12.05C or any other applicable Listing section," *id.* at 27. This conclusion was legal error.

As an initial matter, the ALJ had no legal basis on which to find that claimant's new score was insufficient "to establish intellectual functioning below the range of borderline intellectual functioning." AR at 26. The relevant Listing defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. This definition of mental retardation is satisfied, i.e., "[t]he required level of severity for this disorder *is met*," *id.* (emphasis added), if the claimant meets one of four requirements, including the third requirement, at issue here, which states that the claimant must demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment . . . ." *Id.* at § 12.05(C); *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) ("A claimant *will be considered mentally retarded* if he meets one of four sets of requirements . . . ." (emphasis added)). That is, a verbal IQ score below 70, in combination with another impairment, will, by itself, satisfy the intellectual functioning requirement that the claimant is mentally retarded. *Christner*, 498 F.3d at 793; *Fanning*, 827 F.2d at 633. The only remaining requirement is that a claimant must put forth evidence that this level of functioning was "initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age

---

[2] That the ALJ accepted claimant's verbal score of 68 as valid is supported by his statements confirming the validity of the other scores claimant received during the same test. *See* AR at 26 ("Although the IQ testing performed . . . in February 2004 set forth a verbal score of 68 (down from her previous score of 74), it also placed her performance IQ at 80 (up from 73). That is consistent with her most recent testing that lead to a diagnosis of a math disorder, not a verbal disorder.").

7

22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

Applying these regulations to this case, the ALJ was required to find that claimant's valid verbal IQ score of 68, combined with the finding by the first ALJ that claimant has only the capacity "to perform a limited range of light work,"[3] AR at 52; *see also* AR at 28, 53, necessarily enabled her to meet the definition of mentally retarded, i.e. "[t]he required level of severity for this disorder," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05; *Christner*, 498 F.3d at 793, leaving only the question of whether claimant could demonstrate onset of the impairment before age 22. The ALJ's insistence that claimant instead had to "establish intellectual functioning below the range of borderline intellectual functioning," AR at 26, in some other manner finds no support in Listing 12.05. Claimant has therefore established that she meets the first and second prongs of Listing 12.05(C). As will be discussed below, the ALJ, on remand, will be limited to determining whether claimant has put forth evidence demonstrating onset of the impairment before age 22.

It also bears noting that the ALJ, in finding that claimant did not meet the requirements of Listing 12.05(C), cited no legally sufficient reasons for doing so. First, the ALJ found that the doctor who had performed claimant's new IQ tests had "diagnosed the claimant with borderline intellectual functioning, not mental retardation." AR at 26. The ALJ also noted that "there is no medical documentation which sets forth a diagnosis of mental retardation." *Id.* As explained above, however, all that is required to meet the definition of mental retardation – aside from the onset requirement – is an IQ score between 60 and 70 and another physical or mental impairment that imposes a significant work-related limitation of function. Moreover, recent authority holds that a diagnosis of mental retardation is not required to meet Listing 12.05. *Christner*, 498 F.3d at 793 ("[W]e have specifically held that a formal diagnosis of mental retardation is not required to fall within the confines of section

---

[3]The ALJ failed to reject the prior ALJ's finding that claimant is restricted to light work, and thus a presumption that claimant continues to be able to perform only a limited range of light work applies and claimant meets the additional significant work-related limitation of function prong. *See Fanning*, 827 F.2d at 633 (citing and adopting the conclusions of other circuits that an impairment imposing a significant work-related limitation of function may be found when its effect is "more than slight or minimal," including when a "claimant was limited to light or sedentary work").

8

12.05. Thus, it is clear that claimants need only meet the listing requirements stated in section 12.05. The ALJ erred in giving any credence to the lack of a diagnosed mental deficiency in [this] case."); *see also Fanning*, 827 F.2d at 633 (recognizing that a claimant can meet the impairment of mental retardation based on a single valid IQ score). The lack of a diagnosis of mental retardation, therefore, has no bearing on whether claimant could be found disabled under Listing 12.05.

Second, the ALJ should not have focused on other, higher IQ scores received by the claimant. The ALJ noted that claimant had received scores of 74, 73, and 71 on IQ studies performed in July 2002, AR 26, two years prior to the February 2004 IQ test in which claimant scored a 68. The ALJ also noted that the other scores derived from claimant's 2004 test were higher and more "consistent with her . . . diagnosis of a math disorder, not a verbal disorder." *Id.* The fact that claimant has received other IQ scores that are above 70 is irrelevant for purposes of Listing 12.05, however. The appendix to the regulations provides that "[i]n cases where more than one IQ is customarily derived from the tests administered. . . . we use the lowest . . . in conjunction with 12.05." 20 C.F.R. pt. 404, subp. P, app. 1, § 12.00(6)(c). In addition, the listing also clarifies that only one score within the range is required, stating that a claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. pt. 404, subp. P, app. 1, § 12.05(C). This language recognizes that a claimant may have multiple IQ scores reflecting tests for different types of intelligence, and that only one such score is needed. Moreover, this court has held that "it can be inferred that when multiple I.Q. scores are available the Regulations prefer the lowest score." *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal. 1996). The Ninth Circuit has similarly suggested that only a claimant's lowest score is relevant to Listing 12.05(C), noting that one claimant's IQ scores "ranged from a high of 76 to a low of 69, thereby satisfying the first prong of section 12.05(C)." *Fanning*, 827 F.2d at 633. In *Fanning*, the claimant had achieved a score of 69 on one test performed in 1982, and had subsequently achieved scores of 72, 76, and 72 on a second test performed in 1983. *Id.* at n.2. Certainly if subsequent higher scores do not render an earlier low score invalid for 12.05(C) purposes, there is no reason why claimant's earlier scores above 70 should have any impact on claimant's ability to meet the first prong of 12.05(C) using

her 2004 score of 68. Accordingly, the Court rejects the ALJ's apparent finding that previous higher scores are relevant to determining whether claimant meets the requirements of Listing 12.05(C).

Third, the ALJ improperly relied on claimant's educational history to show that she does not meet the requirements of Listing 12.05(C). He discussed claimant's graduation from her high school's special education department and her completion of six units of junior college, albeit with "some help from a remedial additional class." AR at 26. These are legally insufficient reasons to ignore a valid IQ score, however. Completing high school does not bar a claimant from meeting Listing 12.05(C), particularly where claimant was enrolled in special education classes. *See Markle*, 324 at 187 ("[T]he record evidence did not necessarily undermine the validity of [the claimant's] reported IQ scores" despite the fact that he received a GED). And while a college education has been held to properly contribute to an ALJ's rejection of an IQ score, *see Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (ALJ was not required to accept scores where a claimant earned a two-year college degree and was currently studying for a third year), the ALJ here did not reject claimant's IQ score. Moreover, claimant testified that although she was enrolled in junior college for "about one-half a semester" and "got about six units," AR at 829, she was enrolled in special education courses in math and English, AR 831. The only non-special education classes that claimant appears to have taken were a typing class and a physical education class. *Id.* This very short enrollment in primarily special education classes distinguishes claimant's situation from that described in *Popp,* where the claimant had earned a two-year degree and "was close to completing the requirements for a bachelor of science degree," had "taught high school algebra," and "was not alleged to be failing in his college course studies." *Popp*, 779 F.2d at 1499. The Court finds that these differences effectively distinguish the present case and thus *Popp* can provide no support for the ALJ's position.

Finally, the ALJ should not have relied on claimant's daily activities to find that she did not meet the requirements of Listing 12.05(C). The ALJ noted that claimant passed the written test for her driver's license, "with only limited help in reading," and that she fills out money orders and raised five children on her own. AR at 26. Other courts have held, however, that daily activities such as these are

10

1 not necessarily inconsistent with mental retardation and are therefore not valid grounds for rejecting an IQ score. *See Markle*, 324 F.3d at 186, 187 (ALJ improperly relied on daily activities such as paying bills, using an ATM machine, and administering one's own medication to reject the claimant's IQ score); *Brown v. Sec'y of Health and Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) (daily activities such as using public transit, driving, making change at a grocery store, doing laundry and cleaning, following a road map, and reading a newspaper are not inconsistent with an IQ score of 68). Claimant's ability to take care of herself and her children, though certainly physically and emotionally demanding, is no indication of the intellectual demands of those activities and is not inconsistent with being mentally retarded.[4]

In short, the ALJ committed legal error by relying on improper factors to find that claimant was not mentally retarded. More significantly, however, the ALJ erred by holding that claimant had to make a showing of mental retardation beyond that which is required by Listing 12.05. Contrary to the ALJ's analysis, the definition of mental retardation is satisfied, i.e., "[t]he required level of severity for this disorder *is met*," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05 (emphasis added), if the claimant meets one of four requirements, including the requirement that the claimant demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment . . . ." *Id.* at § 12.05(C). As discussed above, claimant has a valid IQ score of 68, and the first ALJ already found that claimant has demonstrated a physical impairment imposing an additional limitation. AR at 52. Claimant thus meets "[t]he required level of severity for this disorder," *id.* at § 12.05, leaving only the question whether claimant can establish that this level of functioning was "initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22," *id.*

---

[4] The ALJ also noted, in passing, that "claimant was quite articulate at the hearing." AR at 27. It was legal error for the ALJ to rely on claimant's demeanor or speaking ability at the hearing to find that she was not mentally retarded because "[a]n ALJ cannot reject IQ scores based on personal observations of the claimant." *Morales* v. *Apfel*, 225 F.3d 310, 318 (3rd Cir. 2000).

11

### III. The onset of claimant's impairment

As explained above, the onset of claimant's impairment is the only question remaining for purposes of determining whether claimant meets the requirements of Listing 12.05. The ALJ found that "with the exception of statements relative to the claimant being in special education classes as a child, there are not IQ tests or other clinical studies in the record for the period of time . . . prior to age 22. . . . I do not find that the current record establishes the diagnoses of mental retardation prior to the claimant attaining age 22." AR at 26. This was legal error for two reasons. First, as discussed above, a diagnoses of mental retardation is not required, and certainly not required prior to the age of 22. *See Christner*, 498 F.3d at 793; *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006); *Fanning*, 827 F.2d at 633. Second, a showing of early onset for purposes of Listing 12.05 does not require "IQ tests or other clinical studies," AR at 26, performed prior to age 22, *see Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) ("there are many possible reasons why an adult would not have obtained an IQ test early in life and the absence of an IQ test during the developmental years does not preclude a finding of mental retardation predating age 22"); *West v. Comm'r Soc. Sec. Admin.*, 240 Fed. Appx. 692, 698 (6th Cir. July 5, 2007) (unpublished opinion) ("While the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period, a claimant is by no means *required* to produce an IQ score obtained prior to age 22. Thus, the ALJ erred to the extent he implied that the claimant must produce such evidence." (internal citations omitted)).

Here, the ALJ improperly relied on the lack of an IQ test and the lack of a diagnosis of mental retardation prior to age 22. Rather than make a factual determination about the onset of claimant's impairment, the Court remands this case to the ALJ to reconsider whether claimant can show that her impairment was "initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. In so doing, the ALJ should bear in mind that "the regulations only require that a *manifestation* of significantly subaverage general intellectual functioning with deficits in adaptive behavior occur prior

to 22." *Michael v. Apfel*, 2000 WL 1006534 *4 (N.D. Cal. July 7, 2000). The Court notes that claimant may be able to meet this lower burden because she has shown that she was enrolled in special education classes beginning in the first or second grade, AR at 832, and at least one doctor has found that claimant has been impaired since 1962, when she was about eight years old, AR at 24.

## CONCLUSION

For the foregoing reasons and for good cause shown, both motions for summary judgment are DENIED [Docket Nos. 11 & 12]. The Court REMANDS the case for further proceedings in accordance with this ruling, namely a determination of whether claimant's mental impairment developed prior to age 22.

**IT IS SO ORDERED.**

Dated: January 22, 2008

SUSAN ILLSTON
United States District Judge

13